[No. C.D. 2504. En Banc. February 13, 1964.]

*In the Matter of the Disciplinary Proceeding Against* William R. Eddleman, *an Attorney at Law.**

*Reported in 389 P. (2d) 296.

*T. M. Royce,* for Board of Governors.

*Riddell, Williams, Voorhees, Ivie & Bullitt,* for respondent.

HALE, J.—When Anton R. Johansen of Fairbanks, Alaska, consulted William R. Eddleman, a Seattle attorney, in June of 1951, neither could foretell the strange series of events soon to follow, much less that their transactions engendered disciplinary proceedings of the gravest nature.

Johansen, a certified aviation mechanic, owned a two-motored commercial airplane, designated either as a C-47

or a DC-3, which was parked at Boeing Field, Seattle. Hard pressed by numerous creditors, some of whom held liens against his plane, he had talked with Mr. Richard H. Keatinge, a Los Angeles attorney. Since the plane and most of the creditors were in the Seattle area, Mr. Keatinge referred Johansen to respondent Eddleman.

At the time of the first meeting between Johansen and Eddleman, the airplane had not flown for some 22 months, needed mechanical overhaul and maintenance, and repairs to the aileron to cure the damage caused when the wing had been struck by a forklift operated by Pan American Airlines. This last damage Pan American had agreed to mend.

Following their first meeting in 1951, a number of conversations between Johansen and Eddleman occurred, at some of which John Sweet, a young attorney in respondent's office, was present. These conversations culminated in a definitive plan. Johansen agreed to deliver title of the plane to respondent, who, in turn, undertook to raise some money, using both the plane and his personal bank accounts as collateral. Eddleman said he would place the plane in operating condition, pay off all of Johansen's personal creditors, discharge the liens against the plane and obtain repayment of his own funds by chartering the plane out. The plan was explicit except for one salient point: How were Johansen's rights in the plane to be preserved so that, when the time came that both he and it were free of debts and Eddleman had been paid for his services, the airplane would revert to him?

Johansen assented to the plan in general but demurred to its details when he learned that he was to transfer title to Eddleman and receive nothing in writing for it. John Sweet likewise informed both of them that the agreement ought to be put in writing. Respondent said that, since he would be advancing money on his personal credit, he had to be free from the claims of Johansen's creditors. He would not place himself in the position where he could be forced to show a document establishing Johansen's ownership of or

claims in the airplane. He insisted that Johansen's ownership be extinguished of record. Mr. Eddleman's refusal to reduce the agreement to writing makes the first item of complaint with which respondent was charged.[1]

Johansen remained unconvinced and reluctant to part with title to the airplane until John Sweet, in a private interview with him, assured him that he would, if the situation so required, testify that Johansen was entitled to a return of the airplane upon repayment of all sums advanced by Eddleman together with a reasonable fee for Eddleman's services. Thus assured by Mr. Sweet, Johansen gave Eddleman title to the airplane.

They made these arrangements with knowledge that the Korean conflict, then a year old, had changed the airplane, if flyable, into a valuable property and a likely revenue producer. Mr. Eddleman has never explained how Johansen or his survivors could ever prove any interest in the plane in event of the death of either Eddleman, Johansen or Sweet. Respondent's refusal to reduce his agreement with Johansen to writing violated the ethics of the profession, Canons of Professional Ethics 15, 22, 29, 32, RCW Vol. 0. He assumed the leadership in a plan to deceive Johansen's creditors and the public and to pave the way for further misconduct.

Respondent, Mr. Johansen and Mr. Sweet compiled a list of Johansen's creditors and lien claimants and the

---

[1]The hearing panel made the following conclusion on this item:

"Respondent's refusal to reduce the Johansen agreement to writing was for the express purpose of deceiving the public and particularly any creditors of Johansen whose names were not included in the list furnished him by Johansen. The advice and service rendered by him in this respect was disloyal to the law and involved or bordered upon dishonesty and corruption. He voluntarily invited condemnation and failed to advance the honor of his profession. His acts were in violation of Canons 15, 22 and 32 of the Washington State Bar Association Code of Ethics, and in violation of his oath as an attorney. He failed to uphold the honor and dignity of the profession and to improve the administration of justice, as required by Canon 29."

The panel recommended reprimand, in which recommendation the Board of Governors concurred.

amounts of their claims. Respondent borrowed $24,000 from the National Bank of Commerce on both the strength of his title to the airplane and two $5,000 personal bank accounts as collateral. Since he was about to leave Seattle for several weeks, he assigned Mr. Sweet the job of negotiating with the creditors and their attorneys to compromise the claims and reach a final settlement with each of them. Mr. Sweet says that Mr. Eddleman gave him categorical authority to settle each claim for a prescribed amount, and upon this basis he gave the creditors and their attorneys his personal assurances that the money would be paid on the agreed amounts. Upon his return from the trip, Mr. Eddleman repudiated the settlements, disclaiming authority in Mr. Sweet to reach final compromise. Thereupon, Mr. Sweet resigned from Mr. Eddleman's office. This latter incident becomes material only in the light of Eddleman's subsequent assertions that his transactions with Mr. Johansen were not those of attorney and client and that he acted merely as a business manager and investor.

Upon his return to Seattle, Eddleman paid all of the listed debts by disbursing $24,604.33. Eddleman said that the airplane, in its then disabled condition, was worth about $41,000 or $42,000, and he bases this estimate on an actual offer made him.

Through Mr. Keatinge, respondent formed a California corporation named "Kearn, Inc." and purchased all of the stock in it. Mr. Keatinge's office associates were carried on the company books as the incorporators, directors and officers, but their functions were purely nominal as Mr. Eddleman was, in fact, the corporation. He transferred title to the airplane to Kearn, Inc., receiving no consideration therefor, and the plane, now free from all liens and rehabilitated mechanically through respondent's efforts and funds, was flown to California where its base of operations remained during respondent's period of control.

In this fashion, any physical evidence of Johansen's claims to or ownership in the plane were extinguished by the transfer to Kearn, Inc., and the removal of the airplane

from Boeing Field to California. In California, the plane was leased out through respondent's efforts under three separate successive agreements to different lessees. In September or October, 1951, the first revenue derived from these leases, the sum of $5,000 was repaid to the National Bank of Commerce on its loan to Eddleman.

Out of respondent's refusal to give written evidence of Johansen's rights in the plane comes the next incident for which respondent is held to answer in this disciplinary proceeding. It took place in June, 1952.

Eddleman assumed that he had discharged all of Johansen's debts from the funds advanced to him by the National Bank of Commerce, but discovered otherwise when served with a writ of garnishment in the case of Blattman v. Johansen, issued out of the Superior Court of King County, cause No. 446298, demanding answer under oath as to "what amount, if any, you are indebted to . . . and what effects, if any, . . . you have in your possession or under your control" of A. R. Johansen and wife. To this writ, respondent made formal answer in writing saying that he was "not indebted to defendants, A. R. Johansen and D. V. Johansen . . . and . . . did not have . . . any effects belonging to said A. R. Johansen and D. V. Johansen". The answer prayed for dismissal of the writ and for a reasonable attorney's fee.

■ This answer, deliberately made under oath, was false and intentionally misleading. At that time, the plane was in the possession of a corporation created and owned by respondent for the express purpose of managing the airplane. Kearn, Inc., his dummy corporation, did have possession and control of property in which Johansen had a marketable interest. Respondent's answer was thus intentionally misleading and deceptive, again in violation of Canons of Professional Ethics 15, 22, 29, 32, RCW Vol. 0.[2]

---

[2]For this violation, the hearing panel recommended suspension from practice of law for 3 years, which recommendation the Board of Governors reduced by recommending 1 year's suspension.

In May, preceding answer to the writ, attorneys Paul and Morgan, who had brought the Blattman case against the Johansens (Doris Blattman then being a secretary to the law firm of Paul and Morgan and assignee of the claims), submitted to respondent in that action nine separate interrogatories to be answered seriatim under oath. The first question read as follows:

"1. Did you directly or indirectly, as principal or agent, have a contract with the above named defendants during 1951, relating to a *DC-3* Aircraft?" (Italics ours.)

Eight other questions followed, asking for information as to the capacity in which the witness acted, whether as principal or agent, whether the contract was oral or in writing, to state its terms in detail, and whether it had been assigned, and, if in writing, who was the custodian of it, and other inquiries of a similar nature. On June 18th, only a few days after he had answered the writ of garnishment in writing, respondent made written answer to the interrogatories as follows:

"ANSWER TO QUESTION No. 1:  No
"In view of the answer to Question No. 1, questions No. 2 through No. 9 inclusive cannot be answered by this witness."

At the disciplinary hearing on this phase of the complaint, Eddleman sought to justify his answer, claiming that the airplane which he had received from Johansen was a *C-47* and not properly labeled as a *DC-3,* and that, thus, he was technical but truthful in saying that he had no contract with Johansen concerning a DC-3 plane. All witnesses having knowledge of airplanes are agreed that the designations C-47 and DC-3 are and were interchangeable. C-47 is the name for the military version of the DC-3, and R-4D is its designation by the naval service. In all of the negotiations leading to the transfer of the title and the subsequent chartering of the plane, the two designations were interchangeable. Eleven separate exhibits filed in the hearing show that the plane was referred to and designated as a DC-3, including a lease negotiated by

respondent to a Currey Air Transport Company; a mortgage by Kearn, Inc., respondent's wholly owned corporation, to the bank; four insurance riders; several memoranda as to the leases; a repair order; and a letter written by Mr. Eddleman. Altogether, respondent gave three explanations to the hearing panel for his denial of a contract concerning a DC-3 airplane: (1) He said that he had no contract at all with Mr. Johansen in 1951; (2) that as a part of the original understanding with Mr. Johansen, he thought he was to be engaged as Mr. Johansen's lawyer, but, on learning that Mr. Johansen intended to retain Mr. Robert Beresford as his attorney, there was no meeting of the minds and he had in fact no agreement, and, thus, no contract; and (3) the airplane was a C-47 and not a DC-3.

■ Through a welter of conflicting and irreconcilable testimony, we can find no basis on which to sustain respondent's answer. Accordingly, the answer to interrogatory No. 1 must be deemed false and misleading and given with a design and purpose to deceive. It invites discipline for violation of Canons of Professional Ethics 15, 22, 29, 32, RCW Vol. 0, as being corruptly made and constituting chicanery by a member of the Bar.[3]

We find no sensible explanation for respondent's deceptive answer to this clear interrogatory, and any claim to candor in its making evaporates in the next event when attorney Frederick Paul, counsel for plaintiff Doris Blattman, the next day, on January 6, 1953, took respondent's oral deposition before a court reporter. Here is the testimony given:

"Q. Did you have a business transaction with the defendants in this action during 1951? A. Well, suppose you define 'business transaction'. Q. A very broad term,—the broadest kind of term you can imagine. A. Do you want me to take my interpretation or yours? Q. Just say yes or no. Did you have a business transaction with the defendants in this case in 1951? A. In 1951 I was consulted as an attorney. On first meeting A. R. Johanson I did not

---

[3]For the deceptive answer made to the written interrogatories, the hearing panel recommended suspension for 3 years.

enter into a contract of employment with him as an attorney. I think it was sometime along about May or June that he presented me with a number of claims which he told me he had against a DC-3 airplane that was about to be sold by a sheriff's sale, and he offered to sell that plane to me, and I purchased it from him. All considerations due him were paid at that time, and the title was conveyed by a regular bill of sale, which is recorded with the C.A.A. or C.A.B. in Washington, D. C. Q. So you had a business transaction in 1951 consisting of the purchase of an airplane from the Johansons? A. That is correct. Q. Now, what are the documents recording that transaction? A. None except the one I just outlined. Q. A bill of sale. Do you have a copy of the bill of sale? A. I do not. Q. Where are the copies of the bill of sale? A. In Washington, D. C., in the C.A.A.'s office. Q. Do you have the recording number of the bill of sale? A. I do not. Q. Do you have the date of its recording? A. I do not. Q. Did you have any agreement with anyone about the repurchase of that airplane? A. No. Q. How much did you pay for it? A. I don't remember. Q. In the neighborhood of— A. Around 35 to 45 thousand dollars. Something like that. I don't remember precisely. Q. Someplace between 30 and 45 thousand dollars? A. Something like that. Q. And that was paid either directly to him or his creditors? A. That is correct. (Pause) No, that is not quite correct either. Q. Who did you pay it to? A. Part of it was expended by putting the plane in condition. As you know, it was sitting out in a field with grass growing up around the wheels and between the spokes, and vandals having taken a lot of stuff out of it and off of it and a Pan-American plane had run into it and damaged it. There were a number of those things that I include in the capital valuation that I invested in the plane. Q. Putting the plane in condition was an obligation that you assumed after you purchased it? A. No obligation that I assumed. It was just something anybody that is sensible in business would know they would have to do. Q. I want to know what the consideration was that you paid to Johanson for the purchase of the aircraft. A. I have already answered that. Q. Well, was it cash directly to Johansen? A. It was paid to him or for his benefit. I don't remember precisely how the checks were made out or to whom. I didn't, as a matter of fact, make out all of them. Some of my employees did. Q. Did you form a corporation in connection with the aircraft? A. No. Q. No? Is that your answer? A. No. Q. Do

you still have legal title to the aircraft? A. No, I sold it for exactly the same I paid for it. Q. Who did you sell it to? A. I sold it to a California Corporation. Q. What is the name of the corporation? A. Kearn, Incorporated. Q. How is it spelled? A. K-e-a-r-n (spells). Q. Where is their principal place of business? A. I don't know. Q. Do you know any of the employees or officers of the corporation? A. I do not. Q. Do you know where it maintains any office? A. I do not. Q. Do you have any interest in that corporation? A. Yes, I have an interest in it. . . . Q. Does this corporation have any kind of a business relationship of any variety with Tony Johanson? A. None that I know of whatsoever. Q. Who would know if the corporation did have? A. I am sure if there were any, I would know it. Q. Does the corporation have any business relationship with Tony Johanson of any variety? A. None. Q. There is no obligation running from this corporation to Tony Johanson? A. None. Q. Was there ever? A. Never."

We agree with the panel that these answers involved moral turpitude, dishonesty and corruption and constituted fraud and chicane in violation of Canons of Professional Ethics 15, 22, 29, 32, RCW Vol. 0.[4]

That respondent intended to exclude Johansen from any claim of ownership in the plane is seen from his letter to Johansen written January 7, 1953, the day following the oral deposition. On January 5th, Johansen had written respondent pointing out that a year and one half had passed since he had turned the plane over to respondent; he wished

---

[4]"Respondent's answer to Interrogatory No. 1 propounded to him in the Blattman case was knowingly false and misleading and made with intention to deceive. His acts in this regard involved moral turpitude, dishonesty and corruption, and constituted fraud and chicane, in violation of Canons 15, 22, 29 and 32.

"In answering questions propounded to him in his deposition in the Blattman case, respondent was not candid and truthful, particularly in regard to the provisions of the Johansen agreement with respect to the eventual return of the plane to Johansen. In many instances, his answers in the deposition were evasive and contradictory. He failed to live up to his oath as an attorney and violated the canons of ethics hereinbefore mentioned." Conclusions, Board of Governors.

The panel recommended suspension from practice on each of the above items for 3 years. The Board of Governors on these items recommended a reprimand on one item, and 1 year's suspension on the other.

an accounting of the plane's earnings and expenditures, and requested that no further arrangements be made for operation of the plane. He advised respondent that he (Johansen) could make payment in full to him as soon as they arrived at a reasonable figure. Respondent's letter of January 7, 1953, to Johansen, stated in part:

"Your letter of January 5 appears to have been written by someone not familiar with the sale of NC74663 to myself nor my sale to a corporation. As you know, I have never lent you any money nor do I have any legal obligation to return same. Neither is there any obligation to make an accounting, however if you are interested in the purchase or operation of this plane I am advised the corporation is very interested and will be glad to make available full records of operation and expense as well as any other information you require to make an immediate offer concerning which I called you . . ."

With this letter respondent burned his bridges behind him, for in it he not only claimed ownership of the plane but dealt at arm's length with his client by negotiating with him for a sale of the plane as though he were a stranger.

Attorney Robert Beresford of the Seattle Bar had represented Johansen for several years prior to the plane transaction with Eddleman. He remembered a conversation at the Rainier Club in Seattle in 1951 at which his law partner, Wayne Booth, and Eddleman were present. He remembered that Eddleman had said, in explaining the deal with Johansen, that he intended to take title to the plane and through it and his own credit obtain enough money to pay off the various creditors. Eddleman intended to rehabilitate the plane, lease it out, and recover from the leases an amount sufficient to pay all costs together with a reasonable fee to himself (Eddleman); thereafter the plane would be returned to Johansen. Mr. Beresford recalled that out of this conversation and others, Mr. Eddleman had paid Beresford's law firm a fee of $1,500, which was owing them from Johansen for legal services. When Mr. Beresford learned of respondent's answers to the written interrogatories and upon oral deposition, he informed Mr. Frederick Paul,

attorney for the plaintiff in the Blattman suit, of this Rainier Club conversation.

Shortly thereafter, apparently upon being reminded that both Mr. Booth and Mr. Beresford were prepared to testify that Johansen had made neither a gift nor a sale of the airplane to Eddleman, but, on the contrary, that he (Eddleman) had admitted to them his obligation to return the plane to Johansen, Eddleman shifted his ground, and, in a letter on January 28, 1953, indicated that he would return the airplane upon receiving reimbursement for all moneys advanced by him together with a reasonable attorney's fee. This evidence establishes almost conclusively that respondent never had rights to the ultimate ownership of the plane nor did he honestly believe in the existence of such rights.

This brings us to the next items in the complaint of this disciplinary proceeding; they have to do with the claim of breach of trust brought by Johansen accusing respondent of a conflict of interests in negotiating a lease of the aircraft with Currey Air Transport, Ltd.

In the spring of 1953, respondent discussed a proposed charter of the plane with a Captain Herman and his wife who controlled Currey Air Transport. Mrs. Herman's brother owned an airplane ticket agency called Skycoach Air Lines Agency. This ticket company owed respondent a fee for legal services. Mrs. Herman said that Currey Air Transport would not enter a lease agreement with respondent until the fee with her brother had been adjusted. Skycoach Air Lines Agency and respondent agreed upon a fee, and it was paid; the lease of the airplane with Currey Air Transport was thereupon completed.

Currey Air Transport agreed to pay Kearn, Inc., $1,000 a month for 16 months and to perform expensive repairs and alterations to the plane, running into thousands of dollars in costs. An extension of this lease later for 3 months brought the plane two new engines and an additional $500 in cash to Kearn, Inc. In October, 1954, while the lease to Currey Air Transport, as extended, had only 2 more months to run, respondent, in compliance with in-

sistent demands upon him by Johansen through his attorney, Mr. Beresford, furnished them with a detailed auditor's report on Kearn, Inc., covering the company business activities from June 30, 1951, to September 30, 1954. This auditor's report shows that the gross income received from the rental of the airplane for the fiscal year ending June 30, 1952, was $23,500; for the fiscal year ending June 30, 1953, $12,000; for the fiscal year ending June 30, 1954, $12,000; and for the 3 month period ending September 30, 1954, $3,000.

Other income derived from the operation of the airplane through Kearn, Inc., respondent's alter ego, consisted of the installation of two new motors, together with major repairs and important changes to put the plane in good mechanical and flying condition.

Negotiations between Johansen and respondent for the return of the plane to Johansen, upon his repeated and persistent demands, culminated in their meeting at the bank in November, 1954. Mr. Johansen's attorney, Mr. Beresford, accompanied him to the meeting. Mr. Eddleman had prepared and brought to the meeting several copies of a release for signature. In accordance with the agreement earlier reached, Mr. Johansen paid respondent a fee of $9,000 for services in managing the plane, rehabilitating his credit, and kindred professional services. Respondent then turned the plane over to Johansen by transferring to him all of the stock in Kearn, Inc. This gave Johansen his airplane and mastery of the corporation. The parties signed mutual releases exonerating each from further liability arising from the airplane transaction. Mr. Eddleman had paid $1,020 for the stock in Kearn, Inc., so his actual fee on the receipt of the $9,000 came to $7,980.

This exchange of releases did not terminate the relationship of the parties, for some time later Mr. Johansen learned of the fee paid to Eddleman by Skycoach Air Lines Agency while Eddleman had been negotiating the lease of the plane to Currey Air Transport. Johansen asserted that he had no knowledge of Mr. Eddleman's dual negotiations and that

the $16,000 rental for 18 months' operational use of the plane was inadequate. He asked Mr. Beresford to bring suit against Eddleman for an accounting.

Mr. Beresford, remembering the execution of the mutual releases at the bank, advised against such an action as he assumed that insufficient evidence would be available to abrogate the releases.

Thereupon, Mr. Johansen employed Mr. Frederick Paul —the same attorney who had confronted respondent in the garnishment proceeding, the written interrogatories and the depositions—to bring suit against respondent for an accounting of the use of the airplane and income derived therefrom during its operation by Kearn, Inc. Mr. Paul seems to have accepted this employment with more than customary eagerness, and his zeal in prosecuting the claim can in no way be said to have been diminished by his prior professional relationships with respondent. The trial of this cause, Johansen v. Eddleman (King County, No. 515126), produced another item of the disciplinary complaint; it comes from the testimony given by respondent at the trial. He testified in superior court in this case that, in the summer of 1951, when he took over the plane, he believed its value to be $43,000—that indirectly he had received an offer in this amount from a party in Wyoming.

He admitted that, except for his paying about $27,000 of Johansen's debts, Johansen received nothing from respondent for his giving up to respondent title to the aircraft. He said again he felt no legal obligation to return the airplane but only a moral one upon payment of a reasonable fee and reimbursement for all debts discharged by him. But counsel could not pin him down in his examination as to what, in respondent's estimation, a reasonable fee might have been. He said that his claim to ownership was subject to only a moral obligation to return the airplane—and this on compliance with conditions to be laid down by respondent. It was this moral obligation, coupled with Johansen's violent disagreement with respondent's claim of ownership, that induced respondent to accept the offer contained in a letter

from Beresford in January, 1953, of a fee of $9,000 for return of the plane.

Respondent insisted in his testimony that, notwithstanding his acceptance of the Beresford offer, Johansen never had an option to repurchase the plane, that respondent's granting such an option to repurchase was in fact a mere matter of grace to resolve a dispute with a client. He admitted that, despite Johansen's problems with creditors, Johansen was not without resources as he held a high certificate under federal regulations as an aviation mechanic authorizing him to certify to the most intricate and important repairs that could be done to an airplane and that Johansen also was a member of the nonscheduled aircraft industry owning a transport operational certificate having a market value of possibly $100,000. Concerning the previous conflicting statements given by him concerning his arrangements with Johansen, he stuck by his earlier position that Johansen had only respondent's moral undertaking as a lawyer and a gentleman to accept full reimbursement plus a fee to be fixed by respondent in exchange for the airplane.

He was examined concerning his answers on deposition in the Blattman case and first declined responsibility for them by testifying that he had not signed the deposition, had not waived signature and, therefore, had not completed it. But, on being pressed for answers, confirmed the answers as given in the deposition. He again asserted that Johansen had no legal rights in the plane by saying:

"Mr. Johansen had a right to make an offer to me . . . and the reason it was done in that manner was to protect him and the plane against the indebtednesses which were of an indeterminate amount."

Thus respondent is caught in the web of unethical practices, and through earlier conflicting statements challenged the credulity of the court by implying that these practices were undertaken to preserve to his client the very thing the client had been deprived of, his airplane. We accept the condemnatory findings of fact made by the hearing

panel as to its evaluation of the respondent's testimony in King County cause No. 515126.[5]

At the conclusion of the evidence, the trial court found as a fact that the fees received by respondent from Sky-coach Air Lines Agency, while he was negotiating with Currey Air Transport for the latter's rental of the plane, were not excessive for the services rendered and that the lease to Currey was not affected by such fee, and, in addition, was the best bargain to be made under the circumstances. Hence, it was found that respondent received no secret profit and that plaintiff suffered no loss. The case was accordingly dismissed. We affirmed on appeal *Johansen v. Eddleman*, 54 Wn. (2d) 871, 343 P. (2d) 737. The court did find, though, that throughout the leasing of the airplane a fiduciary relationship existed and that respondent acted in the role of trustee for Johansen, however reluctantly.

Quickly following in the wake of the commencement of the superior court action (Johansen v. Eddleman, King County cause No. 515126), respondent set in motion a new

---

[5]"VIII. During the trial of Case No. 515126, respondent attempted to explain his answers in the deposition of January 6, 1953, (Assn. Exh. 4), where he said he did not have any agreement about the repurchase or return of the airplane, by stating that the deposition had not been signed by him and that it, therefore, had not been completed.

"IX. Respondent's conduct and testimony during the trial was such that, in open court, the trial judge stated:

" 'I must say that I think Mr. Eddleman's veracity has been impeached in many respects, even by words out of his own mouth given on different occasions, so on issues of fact where he says one thing and Mr. Johansen says another, I attach greater credibility to the testimony of Mr. Johansen than I do to that of Mr. Eddleman.'

"X. Respondent, in his answer and on various occasions while testifying or subscribing statements under oath, has made such a variety of contradictory statements, many of which are in direct opposition to an overwhelming preponderance of the evidence and his explanations for making such statements have been so groundless that the Hearing Panel has difficulty in granting much credibility to his testimony."

The hearing panel recommended on this item suspension for 3 years and the Board of Governors modified this by recommending 1 year's suspension thereon.

chain of events which ultimately gave rise to an additional charge of violation of canons of ethics. Understandably indignant at Johansen's suit for an accounting—having assumed that the airplane transaction between them had been finally resolved and discharged at the meeting in the National Bank of Commerce in November of 1954, when Mr. Beresford had represented Johansen to conclude the matter—respondent allowed his indignation to get the better of his judgment. Three days after he had received the summons and complaint in Johansen's accounting suit, respondent commenced an action at law against Robert Beresford and wife, referring in his complaint to "surrender by the plaintiff to the defendants of all rights he held in and to a certain DC-3 aircraft" and alleging that defendants "with intent to defraud and deceive plaintiff . . . misrepresented . . . that he had authority to settle all claims on behalf of himself and Anton R. Johansen and Dorothy V. Johansen, his wife, concerning management and operation of a DC-3 aircraft" knowing the same to be false. The complaint accused Beresford of breach of contract, fraud and conspiracy to defraud, and asked damage in the sum of $250,000.

Served with the summons and complaint upon Mr. Beresford and his law firm was a personal letter dated December 2, 1957 on Mr. Eddleman's office stationery addressed to Wright, Booth & Beresford, attention of Mr. Beresford. It accused Mr. Beresford of referring his own files and the claim in the accounting suit to attorney Frederick Paul, of conferring with the latter to institute the action, and closed with these words:

" . . . Unless the action in question is dismissed with prejudice and a letter received, signed by a member of your firm and by Fred Paul, acknowledging the true state of affairs, prior to one week from this date, I will file the action which is herewith served and will find out how much a jury thinks the damages caused by your activity are worth."

Mr. Beresford filed an answer denying the complaint and all of its implications, asserting that he had no interest in

Johansen's claim against Eddleman except his interest in representing Johansen as the latter's attorney in negotiating for and arranging the return of the aircraft. He averred that he had declined to act as counsel for Johansen in the accounting action against Eddleman; at Johansen's directions he had turned over all of the files in the Eddleman matter to Mr. Paul; and he had no interest in and would not participate in the action unless required to do so as a witness.

On December 20, 1957, in this case—which, in the meantime, had been filed by respondent—defendant Beresford took Eddleman's deposition. Curiously enough, the airplane is referred to throughout by all parties as a DC-3 and no one questions its identity because of this. Throughout the deposition in this case, we again have the same doubts expressed by respondent that his actions were those of an attorney; he persisted in referring to his compensation as a management fee and steadfastly declined to label it as an attorney's fee. Once more he asserted under oath that he had been under no legal obligation to return the airplane to Johansen but merely a moral one. He also testified in this deposition that he had turned over all of his files to Beresford so that on a thorough search of his office records, when served in the accounting action, he could find no evidence of a release from Johansen. Shown a copy of the release written on Eddleman's letterhead at the deposition and being examined upon it, respondent expressed doubt that it had been prepared by him. He then stated that the release had not been delivered to him when he received the $9,000 in full discharge from Johansen. He had no doubt that the signatures on the release were genuine.

█ The inconsistencies and evasions in respondent's testimony are too numerous for us to describe. Briefly, respondent's action against Beresford was shortly thereafter dismissed with prejudice, but with costs to the defendants on January 8, 1958. Mr. Beresford paid nothing to respondent for the dismissal. Even though the action resulted in respondent's obtaining a copy of the release which he him-

self had prepared and caused to be signed by both parties, his testimony in the deposition shows conclusively that he had never been misled or deceived by Mr. Beresford as to its existence. Nor would Mr. Beresford have any reason to believe that, when respondent turned over the Johansen files to him, respondent would not have kept an executed copy of the release for his own protection. Respondent's later attempted explanation does not stand up when he asserts that he brought the action against Mr. Beresford because he had never been furnished with a copy of the release. There is no averment in the complaint or in the letter accompanying it referring to such a release (or its evidentiary equivalent), nor is there any evidence whatever that demand or request for the release had ever been made by respondent upon Beresford. We concur with the hearing panel in its conclusion that the action was dishonorably motivated in violation of Canon of Professional Ethics 29, RCW Vol. 0, and brought for the purpose of harassing and injuring the defendant in violation of Canons of Professional Ethics 30, 32, RCW Vol. 0.[6]

One final item of complaint warrants comment, a charge of the improper use of the partnership of Eddleman and Wheeler in violation of Canon of Professional Ethics 33, RCW Vol. 0.

Mason Wheeler, a man of means, had practiced law in Seattle for many years prior to his death in May, 1948. During his latter years, he had rented office space from respondent in a suite shared by several lawyers, all of whom were engaged in separate, individual practice. The names on the doors indicated individual office practice and no partnership association. Although the relationship between respondent and Mason Wheeler appeared to be one of trust and confidence, as is noted by Mr. Wheeler's recommendation to his corporate executor in writing that respondent be engaged as an attorney for his estate in case

---

[6]The hearing panel recommended suspension from practice for 3 years, which recommendation the Board of Governors amended by recommending suspension for 1 year.

of his death, and respondent's designating Mason Wheeler as authorized to draw checks on respondent's bank account, there is no evidence whatever that Mr. Wheeler ever contemplated partnership with Mr. Eddleman. Indeed, at the time of Mr. Wheeler's death in May, 1948, respondent's office letterhead bore only his own name.

About 4 months after Mr. Wheeler's death, that is, during September or October, 1948, respondent commenced using and ever since has used office letterhead and stationery bearing the firm name of Eddleman & Wheeler, some specimens of which indicate Mason Wheeler to have been practicing law years after his death, and other samples of which carried the year of his death in small printed notation.

We agree with the hearing panel that this was a misuse of a deceased lawyer's name and was done for the purpose of deception, all in violation of Canon of Professional Ethics 33, RCW Vol. 0, and that the hearing panel rightly recommended a reprimand for this violation.

This disciplinary proceeding, initiated by formal complaint filed at the direction of the Board of Governors, came on regularly for hearing before a hearing panel consisting of a member of the Board of Governors and two other lawyers. At the conclusion of the hearings, the panel made findings of fact, conclusions of law and recommendations. It drew seven distinct and separate conclusions, based on distinct and separate events, that respondent's conduct, over a protracted period, had been markedly unethical. It made five separate and distinct recommendations that respondent be suspended for a period of 3 years, and on two other claims that respondent be reprimanded. Thereupon, the findings of fact, conclusions and recommendations of the hearing panel were referred to the Board of Governors. The Board approved and adopted the findings of fact; it approved the conclusions and the general conclusions of the hearing panel. The Board declined to concur in the recommendations of the hearing panel in all items except two. It modified one recommendation, a 3-year suspension, by recommending a reprimand; two items of the recom-

mendations that respondent be reprimanded, the Board approved; four items, on which the hearing panel recommended 3-year suspensions, were modified by the Board by a recommendation of suspension for 1 year. In the light of all of these findings, conclusions and recommendations, ours is the duty to make a final judgment.

Respondent concedes his departure from the ethical standards of the profession in some degree, but asserts that a reprimand is sufficient punishment to both protect the public and vindicate the profession. He points out that his lapses in judgment and professional behavior are in part counterbalanced by the good results obtained by him for a difficult client. He claims that no one was harmed or cheated by him or suffered any pecuniary loss. Many of his client's debts were discharged, including some attorney's fees that perhaps would never have been paid.

And, when it was all over, he returned to his client a fine, serviceable airplane free from all debts and liens, thus yielding to the client, through respondent's professional services, a benefit computed by respondent at about $65,000 in value. He points to the long period of time during which he is held accountable, commencing with events in 1951, and asks the benefit of the doubts normally thought to inhere in proof based on conversations only partially, or inaccurately, remembered, or obscured by both time and passing events.

He asks that these events be reviewed in the softened light of time and distance, and that we consider that Mr. Paul—who pursued him so relentlessly after the deceptive answer to the writ of garnishment had been given—harbored toward respondent a feeling of enmity and ill will.

Time has neither dimmed nor softened the effects of respondent's misconduct as a lawyer, but, on the contrary, sharply etches his actions against a continuing daily practice of his profession over several years. Nothing he did or said can thus be held to be the product of sudden anger, or yielding to an overwhelming temptation. Rather, his actions demonstrate a determined will to prevail, whatever

the costs or consequences. Time after time, he had the chance to alter his conduct, to make amends and withdraw from the course he pursued with such ardor.

Mr. Eddleman's course of conduct over a period of years brings him squarely within the letter and spirit of Rule for the Discipline of Attorneys 1, RCW Vol. 0; 57 Wn. (2d) xlvi; 4 Orland's Wash. Prac. Supp. 107. Both the hearing panel and the Board of Governors fittingly described this course of conduct in a formal, general conclusion, as follows:

"The evidence submitted to the Hearing Panel shows that respondent was guilty of acts involving moral turpitude, dishonesty or corruption; that he violated his oath and duties as an attorney, violated various canons of ethics of the profession adopted by the Supreme Court of the State of Washington, and was guilty of a course of conduct demonstrating unfitness to practice law."

■ We start with his sly refusal to give his client a written proof of the client's rights in the airplane against respondent's duty to return the same to his client. By this device he assumed control of his client's property at virtually no risk to himself, for, by his own evidence, he advanced some $27,000 on a plane for which he had been offered $41,000. The Korean conflict had been on for nearly a year. By expending the $27,000, respondent, who had knowledge of the air transport business, knew that not only would all liens be lifted but that the plane would be restored to flying status.

From that point on, including his deceitful answers to the writ of garnishment, his false and misleading answers to the written interrogatories under oath, he showed his continuing unfitness to continue in the profession; and in his false, deceitful and misleading answers under oath on oral deposition, he continued a course of action demonstrably characterized by deceit, pettifoggery and dishonor. His evasions under oath, both in the trial of the accounting action in the superior court, and in the trial of this disciplinary proceeding before the hearing panel, showed that time and travail had taught respondent little concerning the

ethics of the profession or his responsibilities to it, the court and the public.

As if his actions might possibly be viewed in an ambiguous light, he emphasized his previous and concurring misconduct by maliciously bringing an action against a fellow lawyer, solely for the purpose of coercing the lawyer into embarking on what in itself would be deemed to be unethical conduct; that is, to force the lawyer to take steps to dissuade a client from maintaining an action at law which the client had the right to bring. This in itself is a form of corruption. The action against the fellow lawyer, accompanied as it was by a threatening letter, has no justification that we can find either in vindication of the respondent's rights or in enforcement of a correlative duty owed him by the defendant. Respondent clearly maintained the action for purposes of harassment, coercion and malice.

And all during this time, stretching over several years—in a minor sense it is true—respondent carried out his professional activities under a false and deceptive partnership name. This violation of the professional ethics, while minor in degree when compared to the gravity of the other violations noted, further shows respondent's cavalier disregard of his professional responsibility.

We do not think the long period over which these violations took place makes the respondent less culpable, but, on the contrary, emphasizes his continuing unfitness to practice law. He was, and is, unfit to continue in the profession, and he is, therefore, disbarred. His name shall be stricken from the roll of attorneys.

OTT, C. J., HILL, DONWORTH, ROSELLINI, and HAMILTON, JJ., concur.

FINLEY, J. (dissenting)—I do not concur in the majority opinion. It is my view that the court, in disposing of this matter, should adopt the recommendations of the Washington State Bar Association Board of Governors, nothing more, nothing less.

HUNTER, J. (dissenting)—I dissent. I feel disbarment is too severe a penalty in view of the circumstances out of which the unethical conduct of the respondent arose; the failure of evidence to establish that the respondent profited at his client's expense; and which, to the contrary, shows a substantial financial advantage gained by the client by reason of the respondent's services.

The backdrop of this case was a business transaction between Eddleman and Johansen, rather than a typical attorney and client relationship. The misleading evasive tactics of Eddleman began when creditors of Johansen were attempting to garnishee his interest in the C-47 aircraft. Eddleman was the garnishee defendant in the proceeding wherein Johansen was the principal defendant. Eddleman's subsequent unethical conduct, revolving about his dealings in connection with the aircraft, was in bitter adversary proceedings in an atmosphere of disputes and misunderstandings where emotions undoubtedly influenced better judgment. Moreover, much of the controversy was subsequent to the execution of a mutual release and settlement upon a suit instituted by Johansen against Eddleman, which undoubtedly rekindled and intensified the bitterness and misunderstandings.

In the beginning, Johansen had an aircraft that was to be sold at a sheriff's sale to satisfy $24,604.33 in creditors' claims. Eddleman took title to the aircraft, paid off the obligations, and operated it under a corporation in which he was the sole stockholder. The aircraft was rebuilt and extensively repaired and new motors were eventually installed. After approximately three years of controversy between Eddleman and Johansen as to the understanding relative to use of the plane, a voluntary mutual release and settlement was executed, with Johansen paying Eddleman $9,000 in attorney fees and Eddleman, in turn, placing Johansen in ownership and control of the aircraft, which resulted to Johansen's benefit in the value of approximately $65,000.

I believe the Board of Governors of the State Bar Association had this over-all picture in mind when it recommended four 1-year suspensions from the law practice and three reprimands as punishment for the respondent. I deem this sufficient and would follow the Board's recommendation.

POYHONEN, J.† (dissenting)—I would adopt the recommendations of the Board of Governors of the Washington State Bar Association. I believe that the board must have taken into consideration the fact that respondent's misconduct, serious as it was, arose in most part in connection with events 6 to 13 years ago. Time and distance alone would not excuse him, but in recommending the punishment to be imposed in 1964 the Board may very well have taken into consideration the respondent's conduct as a lawyer during the past 6 years.

June 19, 1964. Petition for rehearing denied.

---

†Judge Poyhonen is serving as a judge pro tempore of the Supreme Court pursuant to Art. 4, § 2(a) (amendment 38), state constitution.