[No. C.D. 6318.   En Banc.   December 5, 1985.]

*In the Matter of the Disciplinary Proceeding
Against* WILLIAM V. VETTER, *an
Attorney at Law.*

*Leland G. Ripley* and *Mark W. Muenster,* for Bar Association.

*Murray J. Anderson* (of *Anderson & Anderson*), for respondent.

PEARSON, J.—The Disciplinary Board of the Washington State Bar Association has unanimously recommended that respondent attorney William V. Vetter be disbarred for acts of misconduct involving trust account violations, as well as numerous acts of dishonesty, misrepresentation, and concealment. We adopt that recommendation.

Respondent has challenged virtually every finding of fact and conclusion of law made by the hearing officer and adopted by the Board. He challenges the severity of the sanction as well, arguing that a 2–year suspension is appropriate. However, a careful review of the record shows the findings of fact and conclusions of law to be amply supported by the evidence. Measured against the factors enumerated in *In re Noble,* 100 Wn.2d 88, 667 P.2d 608 (1983), the sanction of disbarment is justified in this case.

I

As a preliminary matter, respondent argues that CPR DR 5–102(A) requires that the entire bar association counsel staff withdraw from its representation of the bar in attorney discipline matters whenever one of its attorneys will testify on behalf of the bar association. He charges that bar counsel's failure to disqualify itself has denied respondent a fair hearing, as well as violated CPR DR 5–102(A).

The bar association argues that Vetter waived this issue before the Disciplinary Board and therefore may not raise the question before this court. Vetter stated in a written statement submitted to the Disciplinary Board that he did not wish "to challenge *at this stage* the conclusion as to the

use of Bar counsel in the proceeding . . ." (Italics ours.) We do not agree that Vetter waived the issue by this statement.

First, we note that the appropriate forum for resolution of the question which involves an alleged conflict between the Code of Professional Responsibility and RLD 2.6(b), promulgated by this court, is the Supreme Court. The Disciplinary Board would have no binding authority on the question.

Furthermore, we hesitate, in a disciplinary proceeding, to hold that an attorney waived an issue without strong evidence of such a waiver. Here, the "waiver" is equivocal; arguably, Vetter merely intended to reserve the issue for appeal to the appropriate body.

Finally, because the issue is one which may arise in the future, we choose to exercise our discretion to respond to the issue, regardless of whether Vetter waived it below. *See In re McGlothlen*, 99 Wn.2d 515, 663 P.2d 1330 (1983).

CPR DR 5–102(A), the rule of disqualification and imputed disqualification, states:

> If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in CPR DR 5–101(B)(1) through (4).

The bar counsel attorney who investigated the charges against respondent and later testified against him properly withdrew from representation of the bar association. Another bar counsel attorney represented the bar at respondent's hearing. The issue here is whether the entire bar counsel staff was required to withdraw under CPR DR 5–102(A).

We hold the entire bar counsel staff does not have to disqualify itself from representing the bar in these circumstances. First, the bar counsel staff acts as an arm of this court in carrying out its responsibility to discipline the

attorneys of this state. This court has directed the bar counsel to both investigate attorney discipline matters and represent the bar association in all disciplinary proceedings. RLD 2.6(b).

Secondly, the underlying rationales for the rule of imputed disqualification do not apply to bar counsel representing the bar association in attorney discipline matters. The part of CPR DR 5–102(A) relating to imputed disqualification was intended to apply where an attorney possesses confidential information about the adverse party because of a prior attorney–client relationship. Because of the intimate working relationships, that information is imputed to the attorney's co–workers, thus requiring the disqualification of the entire legal staff to avoid the potential use of confidential information to the disadvantage of a former client. *See Borden v. Borden,* 277 A.2d 89 (D.C. 1971); *State v. Mercer,* ___ Mont. ___, 625 P.2d 44 (1981); *State v. Martinez,* 89 N.M. 729, 557 P.2d 578 (Ct. App.), *cert. denied,* 90 N.M. 8 (1976); *State v. Hayes,* 473 S.W.2d 688 (Mo. 1971); *Greenebaum–Mountain Mortgage Co. v. Pioneer Nat'l Title Ins. Co.,* 421 F. Supp. 1348 (D. Colo. 1976). The rule is also intended to prevent the appearance of impropriety that inheres in the situation where an attorney has represented a party and then later opposes that party.

Clearly, these rationales do not apply to the bar association's investigative officers operating at the direction of this court. No confidential information can possibly be at issue in an attorney discipline matter where the attorney being investigated is obligated to reveal all pertinent information. RLD 2.8. Furthermore, the appearance of impropriety is not a serious consideration in attorney discipline cases where the general public has little, if any, direct interest in the process. Unlike a public prosecutor, bar counsel's actions affect only attorneys who have voluntarily subjected themselves to regulation by this court. Thus, CPR DR 5–102(A) does not require bar counsel to disqualify its entire staff whenever one of its attorneys is to testify on behalf of the bar association.

Finally, allowing the bar association to investigate and testify as well as to represent the bar association does not deprive an attorney of a fair hearing. Minimal danger exists that the testimony of bar counsel will be given undue weight based on his official position, since the hearing examiners are capable of properly weighing the testimony of bar counsel. Thus, respondent has not shown any bias or unfairness in this case that would warrant a new hearing.

## II

We turn now to an examination of the evidence in this case. The acts of professional misconduct by respondent relate to his handling of only one case, the Rachael Coyne estate. The following background information on the Coyne estate is essential to an understanding of the considerable difficulties respondent encountered in probating this estate.

Bernard and Rachael Coyne had experienced marital difficulties for some time prior to her death; at times, the couple had been estranged. They were, however, married when Mrs. Coyne died.

Mrs. Coyne died intestate in July 1978, leaving her husband, Bernard, and her mother, Grace Henry, as her sole heirs. The estate consisted entirely of the separate property of Mrs. Coyne. Accordingly, Mr. Coyne was entitled to three–fourths of the estate and Mrs. Henry to one–fourth.

The assets of the estate consisted of a waterfront home, valued at $250,000 and subject to a mortgage, various items of personal property, and a business, Pathmaker's Inc., that had been owned and operated by Mrs. Coyne. Pathmaker's was a Washington corporation, with offices in Seattle and Portland, Oregon. The business was engaged in the hiring of domestic services personnel and contracting with private parties to provide such services in their homes.

Pathmaker's was in very poor financial health and was also experiencing operational difficulties when Mrs. Coyne died. Mr. Coyne was unable, in the months following his wife's death, to operate successfully the business of Pathmaker's and had closed both offices by December 31, 1979.

Mr. Coyne employed respondent as attorney to assist him with the probate of his wife's estate. Mr. Coyne and respondent were well acquainted and were involved in a business venture together. That business was unrelated to the probating of Mrs. Coyne's estate. However, respondent's close personal relationship with Mr. Coyne may have affected his professional conduct in handling the Coyne estate.

When the estate opened, serious cash–flow problems existed. No funds were available to make continued mortgage payments on the waterfront property. Pathmaker's was floundering and could not provide any cash. To further complicate the probate, the trustee in Mr. Coyne's personal bankruptcy, filed several years previously, had moved to include the estate property in that action.

Respondent's first action on behalf of Mr. Coyne was to obtain an order of solvency. Mr. Coyne was appointed personal representative and was granted nonintervention powers. In response to the urgent necessity for cash, respondent and Mr. Coyne listed the waterfront property for sale.

Mrs. Henry, immediately displeased by Mr. Coyne's appointment as personal representative, hired attorney Eugene Seligmann to represent her interests in her daughter's estate. Mr. Seligmann's first action was to seek the removal of Mr. Coyne as personal representative.

In response to this action, respondent and Mr. Seligmann entered into negotiations on behalf of their respective clients. The negotiation resulted in an agreed court order revoking Mr. Coyne's nonintervention powers and requiring Mr. Coyne to notify Mrs. Henry of any sales, transfers, exchanges, or encumbrances of any estate asset.

Three months later, Mr. Coyne and Mrs. Henry entered into a settlement agreement negotiated by respondent and Mr. Seligmann. Therein, Mr. Coyne agreed to pay Mrs. Henry $37,500 and certain personal properties as her one–quarter share of the estate. Mrs. Henry agreed that upon payment she would relinquish all further rights and interests in the estate and would, at that time, consent to rees-

tablishment of Mr. Coyne's nonintervention powers.

Respondent and Mr. Coyne continued, in vain, to attempt to sell the only valuable asset of the estate, the waterfront home. The market in 1979 was very poor; no offers of any kind were forthcoming for many months. Finally, a Mr. Plastino offered to trade an unfinished home, worth considerably less, for the more valuable Coyne home. In addition, Mr. Plastino agreed to pay Mrs. Henry the $37,500, to pay the estate $12,000 cash, and to assume various other obligations on behalf of the estate. Mr. Coyne, with respondent's knowledge, entered into this trade agreement with Mr. Plastino. Hence, respondent's first act of professional misconduct arose.

Respondent participated in violation of the agreed court order when he failed to seek court approval for the trade. Respondent's defense to this violation is his stated belief that Mr. Coyne's nonintervention powers had been automatically restored by the filing of an undisputed inventory, thus eliminating the need for court approval.

However, a careful review of the record reveals that respondent could not have believed, in good faith, that Mr. Coyne had nonintervention powers when the trade of properties was made. First, respondent's position is undermined by the fact that he drafted a court order that would have served to reinstate Mr. Coyne's nonintervention powers; clearly, respondent believed such an order was necessary to restore Mr. Coyne's powers. Secondly, the settlement agreement between Mr. Coyne and Mrs. Henry specifically stated that Mrs. Henry would agree to reestablishment of Mr. Coyne's nonintervention powers *only* after she had been paid the $37,500; she had not yet been paid when the house trade was made. Lastly, respondent was fully aware that Mrs. Henry and her attorney, Mr. Seligmann, believed that Mr. Coyne's nonintervention powers remained restricted until reinstated by a court order; Mr. Seligmann wrote respondent numerous letters so stating.

Thus, we conclude that respondent should have realized, or actually did realize, that Mr. Coyne's nonintervention

powers had not been reinstated merely by the filing of an inventory. Accordingly, respondent was legally obligated to obtain court approvals for estate transactions.

Furthermore, the agreed court order and the settlement agreement entered into between Mr. Coyne and Mrs. Henry required that Mr. Coyne give Mrs. Henry notice, even if he did have nonintervention powers. The notice given by respondent consisted of one statement in a letter to Mr. Seligmann that a trade had occurred. No details whatsoever were provided by respondent. Mr. Seligmann repeatedly requested the information to which his client had a legal right. Respondent consistently ignored Mr. Seligmann's requests, with the result that Mrs. Henry, an heir to the estate, was totally without information regarding the only valuable asset of the estate.

These actions by respondent created unnecessary anxiety on the part of Mrs. Henry, as well as frustrating Mr. Seligmann in the performance of his professional duties on behalf of Mrs. Henry. Respondent's flagrant refusal to abide by the court orders violated CPR DR 1–102(A)(4) (dishonesty, fraud, deceit, or misrepresentation); CPR DR 7–102(A)(3) (conceal, knowingly fail to disclose that which he is required by law to reveal); RLD 1.1(b) (willful disobedience or violation of a court order); and CPR DR 7–102(A)(7) (counsel or assist client in conduct the lawyer knows to be illegal or fraudulent).

Respondent's next act of misconduct occurred when Mr. Plastino paid Mr. Coyne $12,000 toward the trade agreement. Respondent was aware that Mr. Coyne had received these funds. Yet, the funds were not deposited to the credit of the estate. Mr. Coyne used the entire $12,000 in his unsuccessful attempt to save Pathmaker's.

Again, respondent did not seek the required court approval for use of the estate funds. Likewise, respondent did not give the required notice to Mrs. Henry or to Mr. Seligmann that the money had been received. As stated, Pathmaker's was in serious jeopardy of going out of business, which eventually occurred. Thus, the $12,000 was

never credited to the estate or Mrs. Henry. Respondent's failure to follow the court orders again violated the Code of Professional Responsibility. This time his conduct also cost the estate $12,000.

Respondent compounded the offense when he prepared a report of personal representative on behalf of Mr. Coyne, filed with the King County Superior Court, which failed to report receipt of the $12,000 from Mr. Plastino. Yet, the report purported to be a full accounting of the activities relevant to the estate.

Clearly, respondent aided his client in breaching his fiduciary duties to the estate. Respondent failed to realize that as the attorney for the personal representative, he represented the Coyne estate, not just Mr. Coyne. These acts by respondent violated CPR DR 1–102(A)(4) (dishonesty, fraud, deceit, or misrepresentation); CPR DR 7–102(A)(3) and (5) (conceal or knowingly fail to disclose that lawfully required to reveal; knowingly make a false statement of law or fact); and CPR DR 7–102(A)(7) (assist client in conduct the lawyer knows to be illegal or fraudulent).

Between June and September 1979, Mr. Plastino did not make mortgage payments on the home traded to him by Mr. Coyne. Seattle–First National Bank began forfeiture proceedings. Under pressure from Mr. Coyne to prevent forfeiture of the property, Mr. Plastino paid $6,700 to respondent to be paid to Seattle–First toward the mortgage. Respondent deposited the $6,700 into the Coyne estate trust account.

Respondent's next act of professional misconduct occurred when he disbursed $3,500 of that money to Mr. Coyne for Mr. Coyne's personal use. Again, respondent did not seek the required court approval, nor did he notify Mrs. Henry or Mr. Seligmann of the disbursement. Thus, respondent aided Mr. Coyne in illegally appropriating estate assets to Mr. Coyne's personal benefit. Mr. Coyne did later repay $2,000 to the estate trust account; respondent noted on his trust ledger that the unpaid amount ($1,500) would be considered an advance on administrator

fees or inheritance to Mr. Coyne.

Respondent knew that he needed court approval to disburse either a fee or a share of the estate to Mr. Coyne, since this was not a nonintervention estate at this point. Also, respondent again violated the agreed court order by failing to make proper notifications.

Respondent once more compounded the offense by his efforts to conceal the entire transaction. Not only did he omit the disbursement of the $3,500 and the repayment of $2,000 from the report of personal representative, he omitted the transactions from the report to the successor personal representative and from the ledger cards furnished to the bar association in connection with its investigation in this matter.

These acts by respondent violated CPR DR 1–102(A)(3) and (4) (illegal conduct involving moral turpitude; dishonesty, fraud, deceit, or misrepresentation); and CPR DR 7–102(A)(7) (counsel or assist client in conduct the lawyer knows to be illegal or fraudulent).

Respondent's next breach of professional ethics arose when he issued two trust account checks for his personal use (one for $1,331.65, another for $1,757.39). He defends his actions by stating that he was owed at least that much in attorney fees by the estate. Assuming that is true, respondent nonetheless committed serious trust account violations. Respondent failed to transfer the money from trust to his general account; rather, he took the money directly from trust. Later, when the estate needed money, respondent redeposited his own funds into the estate trust account. This commingling of personal and trust moneys violates CPR DR 9–102.

Even more serious was respondent's failure to seek court approval for the disbursements, failure to notify Mrs. Henry, and failure to disclose the two withdrawals from the trust account on official reports prepared by himself. These acts involve dishonesty, misrepresentation, and concealment.

Respondent's subsequent action with the estate trust

funds causes even greater concern. Because respondent had disbursed $3,500 to Mr. Coyne and over $3,000 to himself, the estate trust account contained insufficient funds to make the mortgage payment to Seattle–First on behalf of Mr. Plastino. As a result, Mr. Plastino sued respondent personally, alleging conversion of the $6,700 paid to respondent for the purpose of making the mortgage payments.

Respondent's response to this lawsuit was to implead the Coyne estate and transfer the entire Coyne estate trust account into the court registry. The estate trust account had $2,866.88 of Coyne funds at that time. Summary judgment was granted against respondent in the amount of $6,700; Mr. Plastino removed the $2,866.88 from the court registry as partial settlement of that judgment.

Respondent had no right to implead the estate and transfer the money into the court registry since he was being sued *personally* for alleged misappropriation of Coyne estate funds. He could not have believed, in good faith, that he had a right to use his client's funds in his personal lawsuit. Respondent's transfer of the money cost the Coyne estate $2,866.88. Such misuse of his client's money is a violation of CPR DR 1–102(A)(3) and (4) (illegal conduct involving moral turpitude; dishonest, fraudulent conduct).

Respondent moved for reconsideration in response to the summary judgment issued against himself in the Plastino v. Vetter suit, Pierce County Superior Court cause 298574. Respondent's affidavit filed in support of that motion contained a false statement. In describing the various transactions involving the $6,700 paid by Mr. Plastino, respondent omitted the two checks he was authorized by Mr. Coyne to write on the estate trust account for his own benefit. Yet, he falsely stated in the affidavit that the described transactions were the only ones he was instructed to make by Mr. Coyne.

This falsity appears, under all the circumstances, to be another attempt by respondent to conceal the two pay-

ments to himself. This conduct by respondent violates RLD 1.1(a) (moral turpitude, dishonesty or corruption); CPR DR 1–102(A)(3) and (4) (illegal conduct involving moral turpitude; dishonesty, deceit, fraud, or misrepresentation); and CPR DR 7–102(A)(5) (knowingly make a false statement of law or fact).

The next significant event occurred when attorney Seligmann moved to have Mr. Coyne removed as personal representative. The King County Superior Court removed Mr. Coyne as personal representative, finding that he had failed to perform his duties by not giving notices to Mrs. Henry, by making the trade agreement without court approval, by failing to file taxes, by failing to provide a proper and complete accounting of assets, and by generally failing to follow court procedures in an estate in which no nonintervention powers were granted. This order became final, at the latest, on December 23, 1980. The successor personal representative officially took over in February 1981, 2 months later.

After his client had been removed as personal representative, respondent made two deposits to the trust account. He also transferred all of the funds in the estate trust account into the court registry in January 1981. Respondent argues that he had the right to continue to manage the funds until the new personal representative took over. Conversely, RCW 11.28.250 states that when an executor or administrator has been removed, his powers cease at once.

Because Mr. Coyne's powers had ceased, respondent's acts violated RLD 1.1(d) (willfully purporting to act as a lawyer for any person without the authority of that person), and CPR DR 1–102(A)(4) (dishonesty, deceit, misrepresentation). Respondent's failure to disburse the estate funds to the successor personal representative in a timely manner violated CPR DR 9–102(B)(4) (a lawyer shall promptly pay or deliver to the client any properties which the client is entitled to receive).

RCW 11.28.290 requires the removed personal representative to deliver all property and books to the successor personal representative. Here, the successor personal repre-

sentative had to obtain a court order directing respondent and Mr. Coyne to provide an accounting of all Coyne estate assets and to give the new personal representative all ledgers and accounts. In response to that court order respondent furnished a report which omitted the receipt of $12,000 from Mr. Plastino, the disbursement of $3,500 to Mr. Coyne for a personal debt, the $2,000 repayment by Mr. Coyne, the disbursement of over $3,000 to respondent, and over $4,000 repaid to the trust account by respondent. Additionally, respondent failed to give the successor personal representative the trust ledgers as ordered.

Respondent's conduct in failing to provide the successor personal representative the information required by the court order violates RLD 1.1(b) (willful disobedience or violation of a court order); CPR DR 1–102(A)(4) (dishonesty, deceit, misrepresentation); CPR DR 7–102(A)(3) (conceal, knowingly fail to disclose that required by law to reveal); and CPR DR 9–102(B)(3) (maintain complete records of all funds in his possession and render appropriate accounts regarding them).

Respondent's conduct in providing false information in the report to the new personal representative violates (RLD 1.1(a) (moral turpitude, dishonesty, or corruption); CPR DR 7–102(A)(5) (knowingly make false statement of law or fact); and CPR DR 1–102(A)(3) and (4) (illegal conduct involving moral turpitude; dishonesty, fraud, deceit or misrepresentation).

The last area of misconduct by respondent involves his dishonest behavior during the investigation by the bar association. Respondent made intentionally misleading statements to the bar investigator regarding the status of the $6,700 paid by Mr. Plastino. Respondent sent the investigator trust account ledgers that omitted significant transactions, conspicuously the disbursement of estate trust funds to respondent and Mr. Coyne and their subsequent repayment of those funds. Respondent thus violated CPR DR 1–102(A)(4) (dishonesty, fraud, deceit, or misrepresentation).

In sum, respondent knowingly acted in violation of court orders, misappropriated client funds to his own use, aided his client in misappropriating estate funds, made a false statement in a sworn affidavit, filed false and misleading reports with the court, made false or misleading statements to the bar association investigator, improperly handled his trust funds by commingling his personal moneys with client moneys, and attempted to conceal his improper conduct numerous times. We turn now to the question of the appropriate sanction in this case.

This court has adopted the general rule that, absent extraordinary mitigating circumstances, disbarment is the usual sanction for misappropriation or misuse of client funds. *In re Noble,* 100 Wn.2d 88, 92, 667 P.2d 608 (1983); *In re Moynihan,* 97 Wn.2d 237, 238, 643 P.2d 439 (1982); *In re Kumbera,* 91 Wn.2d 401, 403, 588 P.2d 1167 (1979). Disbarment, however, is not the automatic sanction for trust account violations; every disciplinary proceeding warrants an individual analysis of the facts pertinent to that case. *In re Salvesen,* 94 Wn.2d 73, 76, 614 P.2d 1264 (1980). In determining the appropriate sanction in this case, we turn to the factors enumerated in *In re Noble, supra.*

The first relevant *Noble* factor is the purpose of attorney discipline. Foremost, this court recognizes that the purposes of attorney discipline are limited to the protection of the public and to the deterrence of other attorneys from similar misconduct. Punishment is never the goal, but merely the inevitable sequela of the sanction. *In re Noble,* at 95.

Here, respondent has not acknowledged that the preponderance of his actions were in any way dishonest or deceitful. He accepts no responsibility for the acts of ethical misconduct he imposed upon his client, the courts and fellow attorneys. We do not imply that repentance on respondent's part could have saved him from severe sanction; however, his continued insistence that he has acted properly leaves us quite uncertain that he would not repeat his ethical misconduct. Sincere recognition of his breach of

ethical duties would have weighed in respondent's favor. Absent some manifestation of that recognition, we can only surmise that no such recognition exists.

The duty of this court is to protect the public from dishonest, deceitful lawyering. Where we are unable to conclude that there is minimal danger of future misconduct, we must adopt the sanction designed to provide the highest degree of public protection. That sanction is disbarment.

Additionally, the serious acts of misconduct by respondent warrant a serious sanction to deter other attorneys from similar breaches of professional ethics. Unquestionably, disbarment is a more severe sanction than suspension. A suspension may last a maximum of 2 years. RLD 5.1(b). At the end of the suspension period, the attorney is automatically reinstated.

Conversely, a disbarment has a minimum term of 3 years. The attorney may petition for reinstatement after that period; if he is denied reinstatement by this court, he must wait 2 more years before he may re–petition. RLD 9.1(a). The petitioner carries the burden of proving that his reinstatement will not be detrimental to the judicial system, the administration of justice, or to the public interest. RLD 9.6(a). If the petition is approved, the petitioner must successfully retake the bar examination. RLD 9.7(a). Clearly, a sanction as severe as disbarment should have, as a deterrent, the greatest effect on other attorneys.

The second *Noble* factor is the proportionality of the recommended sanction to the misconduct of the attorney. We compare the sanction at hand to sanctions imposed in similar cases to make this determination. We also consider all relevant mitigating or aggravating factors in our analysis. *See In re Salvesen, supra; In re Deschane,* 84 Wn.2d 514, 527 P.2d 683 (1974).

Here, respondent has committed serious trust account violations; such conduct has led this court to disbar attorneys in numerous cases. We identified 46 such cases in *In re Rosellini,* 97 Wn.2d 373, 377–78, 646 P.2d 122 (1982). Accordingly, disbarment of respondent would not be dis-

proportionate to his conduct, nor to the sanction imposed on other attorneys for similar conduct, based only on the trust account violations.

However, respondent's conduct did not involve only trust account violations. He acted with dishonesty, bad faith, deceit, and tried to conceal his transgressions again and again. These acts alone could justify respondent's disbarment. *See In re Eddleman,* 63 Wn.2d 775, 796, 389 P.2d 296 (1964) (disbarred because of deception, deceit, false responses to interrogatories and on oral deposition), *cert. denied,* 379 U.S. 990 (1965).

Respondent has offered no mitigating factor and we are unable to discern any from our study of this record. We have, however, considered a number of factors in reaching this conclusion.

First, we fully recognize the difficulties involved in probating the Coyne estate. Respondent was faced with a very complex case. A complex case, however, does not excuse dishonest behavior by the attorney involved. Respondent's unethical conduct only exacerbated the problems of the Coyne estate.

Second, respondent's improper and illegal disbursement of estate assets to Mr. Coyne is not mitigated by the fact that Mr. Coyne had an eventual right to the money as the primary heir. Respondent proceeded with complete disregard for the rule of law in distributing estate assets without court approval. Whether Coyne was an heir or not is irrelevant as to respondent's professional behavior.

Third, we have considered that respondent has no prior record of disciplinary action. He has successfully practiced law in Washington since 1968. Nonetheless, lack of prior misconduct is not in itself a sufficient mitigating factor to prevent disbarment. *In re Moynihan,* 97 Wn.2d at 238; *In re Zderic,* 92 Wn.2d 777, 788, 600 P.2d 1297 (1979).

Finally, the misconduct by respondent certainly cannot be characterized as an isolated violation merely because only one client or one case was involved. Rather, his transgressions occurred repeatedly over a considerable period of

time and were, in many instances, intentionally designed to cover up past misconduct. Thus, we conclude that no mitigating factor exists in this case.

However, aggravating factors do exist. Respondent gave false and misleading responses to the bar association investigator, which weighs against him. His complete failure to accept responsibility for his actions is also an aggravating factor. Therefore, we are unable to conclude that disbarment is a disproportionately excessive sanction here.

The third *Noble* factor we consider is the effect of the sanction on the attorney. Here, we weigh the nature of the misconduct against the hardship imposed on the attorney by the recommended sanction. The nature of respondent's misconduct was most egregious. The most severe sanction, disbarment, will obviously impose severe hardship on respondent. Nonetheless, we cannot conclude that the hardship is disproportionate to the serious nature of the offense.

The fourth *Noble* consideration is whether the Board's recommendation is amply supported by the record. As detailed above, this factor is met here.

Finally, we look at the degree of agreement among the Board members as to the recommended sanction. Here, the Board unanimously recommended disbarment of respondent. This court gives serious consideration to the Board's recommendations; we will only reject a unanimous decision when we can articulate specific reasons for doing so. *In re Noble,* 100 Wn.2d at 95.

Here, we are unable, after application of the *Noble* factors, to articulate any reason to depart from the Board's recommendation. Accordingly, William V. Vetter is disbarred and his name is stricken from the roll of attorneys in this state.

DOLLIVER, C.J., and UTTER, BRACHTENBACH, CALLOW, and DURHAM, JJ., concur.

ANDERSEN, J., concurs in the result.

DORE, J. (dissenting)—The Disciplinary Board's recommendation of disbarment which is adopted by the majority is in my view "clearly excessive, weighing the nature of the misconduct against the hardships imposed on the attorney." *In re Noble,* 100 Wn.2d 88, 96, 667 P.2d 608 (1983). I dissent.

While "[l]awyers must preserve the integrity of entrusted funds", *In re Moynihan,* 97 Wn.2d 237, 238, 643 P.2d 439 (1982), disbarment for failure to do so is not automatic. *See In re Noble, supra.* The appropriate sanction must be determined on a case–by–case basis after considering all the circumstances. *In re Salvesen,* 94 Wn.2d 73, 614 P.2d 1264 (1980). In making this determination, this court is committed to the proposition that the primary purpose of attorney discipline is not only to punish the attorney for his misconduct but to protect the public and deter other lawyers from similar misconduct. *In re Smith,* 83 Wn.2d 659, 521 P.2d 212 (1974).

The attorney in this case is a sole practitioner who was admitted to practice in this state in 1968. In well over a decade of practice, he never was the subject of a disciplinary proceeding other than the subject one. The action and charges relating thereto all arise from his mismanagement of a single estate. The probate of this estate was complex and beset with numerous problems unconnected with those of the attorney's own making. Nothing in the findings by the Board suggest that the attorney intended to deprive the estate of any funds.[1] Despite these facts, the majority concludes that Vetter should be disbarred.

In *Noble* this court, in discussing the seriousness of the 90–day suspension, noted that the attorney must notify all his clients that he is being suspended, that a notice proclaiming his suspension would be published in the Washington State Bar News and a newspaper of general

---

[1] Petitioner without a court order of authorization paid himself attorney's fees from estate moneys for accrued estate work. He later voluntarily paid the money back.

circulation, and that the attorney would suffer considerable financial loss. If a 90–day suspension, where the attorney failed to return the $25,000 he had stolen from his father's estate and never repaid, was appropriate in *Noble,* then a disbarment is most certainly out of line here.[2]

The majority, in adopting the Board's recommendation of suspension, states at page 795 that

> Finally, we look at the degree of agreement among the Board members as to the recommended sanction. Here, the Board unanimously recommended disbarment of respondent. This court gives serious consideration to the Board's recommendations; we will only reject a unanimous decision when we can articulate specific reasons for doing so. *In re Noble,* 100 Wn.2d at 95.

I feel that if we take such a position we abdicate our responsibility for determining the ultimate sanction for attorney misconduct. *See In re McGlothlen,* 99 Wn.2d 515, 663 P.2d 1330 (1983); *In re Clark,* 99 Wn.2d 702, 663 P.2d 1339 (1983); *In re Espedal,* 82 Wn.2d 834, 514 P.2d 518 (1973). Further, the Board's recommendation is not always sound. In *In re Noble, supra,* the Board recommended a 90–day suspension on the condition that the attorney repay the misappropriated money within 90 days of its recommendation. The money ($25,000) was not repaid 4 years later and yet this court continued to honor the Board's recommendation. It would seem to me if restitution of the estate funds was the cornerstone of the 90–day recommendation, failure to do so should terminate the recommendation, or at least the Board should have had an opportunity to review the matter. We should be wary of automatically accepting the Board's recommendation especially when conditions on which it is grounded are flagrantly violated. We should carefully scrutinize each case and reach our own conclusions and discipline.

In the present action, I feel that the circumstances totally

---

[2]Noble's brother, a 50 percent beneficiary of his father's estate, had not received a dime 4 years after his father's death and at the time the *Noble* decision was released.

fail to warrant disbarment. A 1–year suspension, in my view, would be appropriate and fair, *In re Noble, supra.*

GOODLOE, J., concurs with DORE, J.