960 P.2d 416 (1998)
136 Wash.2d 67
In the Matter of the DISCIPLINARY PROCEEDINGS AGAINST Wade R. DANN, Attorney at Law.
No. 7552.
Supreme Court of Washington, En Banc.
Argued June 16, 1998.
Decided August 13, 1998.
Joanna Abelson, Kurt Bulmer, Seattle, for Washington State Bar Ass'n.
David Swartling, Mills, Meyers & Swartling, Seattle, for Wade R. Dann.
ALEXANDER, Justice.
Attorney Wade R. Dann appeals to this court the recommendation of the Washington State Bar Association Disciplinary Board that he receive a year-long suspension from the practice of law due to four counts of misconduct. The misconduct involved Dann's misrepresentations to clients, at two different law firms, concerning which attorneys and firm employees worked on four cases. We adopt the Disciplinary Board's recommended sanction.

I. FACTS
Wade R. Dann was admitted to the practice of law in Washington in 1973. Prior to March 1991, Dann was a partner in a law firm called Ulin, Dann and Lambe (UDL). In March 1991, Dann and two associate attorneys left UDL and formed a new law firm, Dann Greenberg Radder (DGR). Dann's new partners had considerably less experience as attorneys than Dann did. John Radder, the managing partner of DGR, and Charles Greenberg had begun their legal careers as associates with UDL in 1986 and 1988 respectively. For both Radder and Greenberg the founding of DGR represented their inaugural experience as partners in a law firm.
Dann's specialty had long been construction law. DGR employed two non-attorney construction claims analysts, David Graham and William Werner, during 1991 and 1992. Graham had also worked for Dann at UDL. Attorneys and construction analysts at UDL and DGR used a computer billing system to record the time they spent on client matters. Billings were prepared at both firms in essentially the same way. The billing data for Dann was dictated to, and entered into the system by, a staff member. A bookkeeper would use this computer data to generate pre-billing, or "work in progress" (WIP), statements. A WIP would identify alphabetically *417 by client the number of hours billed by each timekeeper, coupled with a brief description of the services performed for the client. The initials of the person billing the time would be recorded on the WIP. The WIPs would then be reviewed by the attorneys billing the hours. At DGR, Radder was generally responsible for initially reviewing Dann's WIPs. That firm's bookkeeper would take the edited WIPs and prepare final billing statements for the clients.
On a daily basis Dann would record the names of clients for whom he had done work. He did not, however, keep time records contemporaneously. He would often write billing information on pieces of paper and then put them in his time book so that he could later remember what work he had done. At the end of the month Dann would reconstruct the time that he had worked from these pieces of paper and dictate it for entry into the WIP format. He would also jog his memory concerning his billable hours by reviewing the WIPs for his associates.
While a partner at both UDL and at DGR Dann switched initials on a number of WIPs, giving one person credit for work performed by another. At DGR the practice of initial-switching was openly discussed at partnership meetings that included the office administrator, Linda Crawford. In July 1992, Radder, Greenberg, and Crawford held an informal meeting where they decided to end the initial-switching practice. On July 15, 1992, Radder issued an e-mail to his other partners, Crawford, and the bookkeeper warning of "major league trouble" if the initial-switching practice continued and was discovered. Ex. 2C. The practice was discontinued.

A. Brutoco Account
Dann represented Brutoco Construction and Len Brutoco over a number of years beginning in the late 1980s. Tom Salata was Brutoco's "right-hand man," and handled bills and claims. Transcript of Proceedings (TP) at 376. One claim that Dann was involved with for Brutoco arose during 1992 and was referred to as the "Cerritos claim." Salata specified that he did not want Dave Graham to work on the Cerritos claim. Dann and Salata agreed that Radder would work on the claim instead. Nevertheless, Dann and Radder agreed that Graham would work on the claim also, but that Graham's initials would not be shown on the bill. On a WIP for hours billed in February 1992, there is a notation in Dann's handwriting: "Change DG's [Dave Graham's] time to JR's [John Radder's] timebut pay Dave for his time." Ex. 2D. From that point forward Graham's initials were removed from WIPs and replaced with those of Radder for purposes of the final billing, in addition to the record for the work that Radder actually did. Radder's billing rate was higher than Graham's, so Radder wrote off time in an amount that exceeded the aggregate amount of overbilling and the client was, thus, not overbilled. Dann admits that Graham actually worked hours attributed to Radder.

B. Henderson Account
William Henderson, a building contractor, had been a client of Dann's since early 1990. In 1992, Dann worked on a claim involving the "North Cascades Visitor Center" project. Henderson specifically requested that just one attorney, Dann, and one claims analyst, Graham (who Henderson considered to be "extremely competent"), work on the case. TP at 167. During the course of the work Henderson believed that Graham was working on the claim because he met with Graham and Dann at the project site in June 1992 and was told by Dann that Graham was working on the claim for months after that. In fact, Graham had discontinued his work on the project following the death of his parents shortly after meeting with Henderson. The law firm's other claims analyst, William Werner, took over Graham's work.
Billing statements sent to Henderson in July and August showed that Graham was still working on the claim, when in fact Werner was. This misrepresentation began with the WIPs. On one WIP, for example, Dann crossed out Werner's initials and substituted Graham'sinstructing, though, that Werner should get "credit for hours." Ex. 3E. On another WIP, the bookkeeper wrote as follows: "Per Wade [Dann] reenter DG. WJW *418 [William J. Werner] gets credit. No credit to DG." Ex. 3B. On a third WIP, the bookkeeper made the following notation: "Per WRD [Wade R. Dann] delete WJW. Replace DG." Ex. 3C.
On a number of occasions Dann also told Henderson that Graham was working on the claim when, in fact, Graham was not and had actually left DGR. DGR wrote off time so that Henderson would not be overbilled, resulting in a slight underbilling in the aggregate. However, Henderson felt that his construction claim was so damaged by Werner's involvement that no work should have been billed in the first place. He indicated, "[H]ow can you give me money back when you didn't do anything?" TP at 179. Of Werner, he said that "I came to the conclusion that he couldn't tell the inside of the building from the outside of the building. He knew nothing about construction." TP at 172. In contrast, he felt that "Graham was one of the best construction people that I'd ever met." TP at 172. Henderson subsequently sued Dann and DGR. The matter was settled in mediation, and Dann's firm paid a $20,000 malpractice insurance deductible. Dann has expressed remorse over this matter.

C. Vertecs Account
Vertecs Corporation had been a client of Dann's since the late 1970s. In 1990, a lawsuit was brought against Vertecs as a result of work it had done on the Kingdome roof. Handling the case with Dann was a UDL associate named Philip Hickey. Hickey was actually the attorney actively managing the case, and Dann reviewed his WIPs. On WIPs that reflected hours that were billed in October, November, and December 1990, Dann substituted his initials for Hickey's. Accordingly, the billing statements sent to clients showed that Dann performed work that was done by Hickey. Notations in Dann's handwriting on the WIPs request that this initial-switching occur, with Hickey getting credit within the firm for hours worked. Dann admits this initial-switching, and explains that he had worked the number of hours that he billed, and that the activities that Hickey had performed for which Dann had taken credit were "similar work." Clerk's Papers (CP) at 25. However, Dann admits that his hourly billing rate at this time was $175 and Hickey's was $140, although he denies that overbilling occurred as a result. Vertecs paid these bills in full.

D. Restec Account
Restec was Vertecs' subsidiary. Dann and Hickey handled a sexual harassment claim against Restec brought by a former employee. Hickey had primary responsibility for the case. Moreover, as was true in the Vertecs' case, Dann substituted his initials for those of Hickey on WIPs reflecting hours worked in August 1990 and October through December 1990. For example, on one WIP there is the following notation from Dann: "Put my initials here but give Phil [Hickey] credit for hours." Ex. 5C. Thus the bills that Restec received showed Dann working hours actually worked by Hickey. Again, Dann admits initial-switching but claims that this was a result of his desire "to avoid double billing the client for work on the same matter performed by two members of the firm." CP at 27. Dann admits the same differential in hourly billing rates during the October through December 1990 period as in the Vertecs case, and admits that in August 1990 Hickey billed at $125 hourly and Dann at $150. He denies, however, that overbilling occurredeven though he admits that Restec paid its account in full.
In January 1993, a former DGR associate mailed letters to all DGR clients indicating that the firm was under investigation for its billing practices by the Washington State Bar Association (WSBA). On March 31, 1996, a front page article about the investigation appeared in the Sunday joint edition of The Seattle Times and the Seattle Post-Intelligencer entitled "Lawyers who flouted the rules escape reprimand." On May 20, 1996, the WSBA filed a formal complaint against Dann.[1] A three-day disciplinary hearing commenced *419 on August 7, 1996. On October 24, 1996, Hearing Officer James C. Hanken recommended a two-year suspension for Dann due to four proved counts of violating Rule 8.4(c) of the Rules of Professional Conduct (RPC) by initial-switching. He also recommended a reprimand for Dann based on his finding that Dann committed additional violations of RPC 8.4(c) by secretly tape recording a telephone conversation with another attorney and, unbeknownst to that attorney, allowing a party interested in the topic of conversation to listen in. Dann appealed to the Disciplinary Board, which unanimously adopted the hearing officer's findings of fact, conclusions of law and recommended reprimand, while also, without comment as to its reasons, reducing the term of Dann's suspension to one year.
Dann now appeals the Disciplinary Board's decision recommending a one-year suspension, contending that a clear preponderance of the evidence did not support the findings of misconduct and aggravating factors for his initial-switching activities, and that the sanction of a year-long suspension from the law is disproportionate punishment. Dann has not appealed the reprimand arising from the telephone incident.

II. ANALYSIS
Acts of misconduct in bar discipline cases must be established by disciplinary counsel by a clear preponderance of the evidence. RLD 4.11(b). This standard of proof "is somewhat lower than the beyond reasonable doubt standard required in criminal prosecutions." In re Disciplinary Proceeding Against Allotta, 109 Wash.2d 787, 792, 748 P.2d 628 (1988). Where a hearing examiner's findings of fact are supported by a clear preponderance of the evidence, this court will not disturb them. In re Disciplinary Proceeding Against McMullen, 127 Wash.2d 150, 162, 896 P.2d 1281 (1995). Moreover, this court may not substitute its own evaluation of the credibility of witnesses over that of the hearing examiner. McMullen, 127 Wash.2d at 162, 896 P.2d 1281.
The American Bar Association's Standards for Imposing Lawyer Sanctions (Approved Draft, 1986) govern the determination of a sanction in attorney discipline cases in Washington. In re Disciplinary Proceedings Against Johnson, 118 Wash.2d 693, 701, 826 P.2d 186 (1992). Under the Standards, we engage in a two-stage process: "First, we determine a presumptive sanction by considering (1) the ethical duty violated, (2)the lawyer's mental state and (3) the extent of the actual or potential harm caused by the misconduct. Then, we consider any aggravating or mitigating factors which may alter the presumptive sanction." Johnson, 118 Wash.2d at 701, 826 P.2d 186 (citations omitted).

A. Were the Charges Against Dann Proved?
The threshold question before us is whether the burden of proof was sustained with regard to the charges that the hearing examiner found to be proved against Dann. RPC 8.4(c) provides that "[it] is professional misconduct for a lawyer to ... [e]ngage in conduct involving dishonesty, fraud, deceit or misrepresentation." Simply put, the question is whether the attorney lied. No ethical duty could be plainer. However, Dann's argument talks around the fact that he lied to clients about who was doing their legal work. He does not deny initial-switching. Rather, he offers various explanations as to why this lying occurred. That goes to mitigation and not to the truth of the underlying charges. For example, the fact that Brutoco was underbilled on the Cerritos claim does not change the fact that Dann lied to Brutoco about the participation of Graham in that claim, despite his client's stated desire that Graham not be involved. With regard to the Henderson claim, Dann argues that his motivation for lying about the fact that Graham was not working on the case "was to protect Mr. Graham's privacy [following his parents' death] and to avoid giving his client any reason for unnecessary concern regarding the handling of his case." Resp't's Opening Br. at 19. This does not explain away lying to a client.
Dann also argues that overbilling of clients was not proved in the Vertecs and Restec cases. However, Dann does not deny switching his initials for those of Phil Hickey in those cases to take credit for work that *420 Hickey had done. He does not deny earning $25 to $35 more a billable hour than Hickey at the time of those cases. He argues, with no supporting documentation, that he did work similar to that of Hickey and, thus, should be paid for the same number of hours. He further argues that "Vertecs and Restec were not overcharged because substantial amounts of Mr. Hickey's time was [sic] written off." Resp't's Opening Br. at 27. This time was written off, however, only to be substituted with more expensive timethat of Dann. Dann apparently advocates a system whereby attorneys need not keep their own billing records but can merely claim work done by subordinates as their own when it is convenient and then, in the absence of any records to support the claim, can excuse their actions by arguing that they are somehow doing the clients a favor by writing off the less expensive time.
There is no reason why the hearing examiner or the Disciplinary Board should have been persuaded by Dann's description of his belated accounting. Guidance from two federal appellate courts is relevant here. The Tenth Circuit has written that "we believe that reconstructed records generally represent an overstatement or understatement of time actually expended." Ramos v. Lamm, 713 F.2d 546, 553 n. 2 (10th Cir.1983). The Second Circuit has noted that "[t]here is no excuse for an established law firm to rely on estimates made on the eve of payment and almost entirely unsupported "by daily records." In re Hudson & Manhattan R.R. Co., 339 F.2d 114 (2d Cir. 1964). Furthermore, this court has "consistently held that we will not disturb factual findings made by a hearing officer upon conflicting evidence." In re Disciplinary Proceeding Against Selden, 107 Wash.2d 246, 251, 728 P.2d 1036 (1986). The hearing officer's determination that Vertecs and Restec were overbilled was a reasonable one given the evidence before him.[2]
The hearing officer found that Dann acted knowingly in his misconduct. Thus, his mental state was one of knowledge. We have written that "[a] lawyer violates the rules with knowledge when he or she has `the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result.'" McMullen, 127 Wash.2d at 169, 896 P.2d 1281 (quoting STANDARDS FOR IMPOSING LAWYER SANCTIONS Definitions, at 7 (1986)).
We give "particularly great weight" to the question of the extent of injury involved due to the attorney's misconduct. In re Disciplinary Proceeding Against Curran, 115 Wash.2d 747, 772, 801 P.2d 962, 1 A.L.R.5th 1183 (1990). We do so to "maintain public confidence in our legal institutions with an eye toward enhancing respect for the law generally. We must therefore administer the rule in a manner which holds individuals accountable for the results, even unintended results, of their actions." Curran, 115 Wash.2d at 772, 801 P.2d 962 (emphasis added). Thus, for example, even if the overbilling of Vertecs and Restec was unintended, it is still censurable. The familiar benchmark of the attorney-client relationship is that "[a]ttorneys have a duty of zealously representing their clients within the bounds of the law. When their clients have opposing interests with third parties, attorneys are supposed to represent their clients' interests over the interests of others." Bohn v. Cody, 119 Wash.2d 357, 367, 832 P.2d 71 (1992). After all, "an attorney must continually be aware that the attorney-client relationship is a fiduciary one as a matter of law and thus the attorney owes the highest duty to the client." Perez v. Pappas, 98 Wash.2d 835, 840-41, 659 P.2d 475 (1983) (citing Liebergesell v. Evans, 93 Wash.2d 881, 890, 613 P.2d 1170 (1980); McCutcheon v. Brownfield, 2 Wash.App. 348, 356-57, 467 P.2d 868, review denied, 78 Wash.2d 993 (1970)). Dann's actions are not in keeping with the high responsibility *421 that rests with attorneys. Lying to clients is an assault upon the most fundamental tenets of attorney-client relations. "`The relation of attorney and client has always been regarded as one of special trust and confidence.'" In re Proceedings for Disbarment of Beakley, 6 Wash.2d 410, 423, 107 P.2d 1097 (1940) (quoting approvingly 7 C.J.S. Attorney and Client § 127). Dann's misconduct certainly warrants the presumptive sanction of suspension from the practice of law: "Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed to the profession and causes injury or potential injury to a client, the public, or the legal system." AMERICAN BAR ASS'N, STANDARDS FOR IMPOSING LAWYER SANCTIONS std. 7.2, at 14 (1991).[3]

B. The Penalty
The second issue is whether the sanction of a year-long suspension from the law is disproportionate to the offenses that Dann clearly committed. Accordingly, we next examine the aggravating and mitigating factors in this case. Under the Standards, 10 factors associated with attorney misconduct are considered as aggravating the misconduct. See, e.g., Johnson, 118 Wash.2d at 705-06, 826 P.2d 186 (listing factors). Five were found by the hearing officer here. They were: "(b) dishonest or selfish motive; (c) a pattern of misconduct; (d) multiple offenses; (g) refusal to acknowledge wrongful nature of some conduct; and (i) substantial experience in the practice of law." CP at 155. Dann contests the first four as being unsupported by a clear preponderance of the evidence.
Four counts of violating RPC 8.4(c) proved against Dann are involved in this appeal. As noted above, Dann does not appeal the reprimand imposed upon him for secretly taping a phone conversation with another attorney, and allowing an interested party to secretly monitor that conversation. This, and the proved instances of initial-switching, establishes the aggravating factors of "a pattern of misconduct" and "multiple offenses." With the exception of the Henderson case, where his misconduct was arguably the most egregious, Dann has been remorseless about his misconduct. He rationalizes it. Indeed, far from showing repentance, his briefs to this court are full of animus toward the former DGR associate who initiated the WSBA investigation. He repeatedly characterizes the former associate as "disgruntled,"[4] as if the motiveseven assuming the characterization to be trueof the employee in whistle-blowing have any bearing upon the wrongs that he brought to light. This suggests to us a "refusal to acknowledge [the] wrongful nature of some conduct." Indeed, Dann's harsh characterization of the grievant who initiated this case makes it appear that what Dann is, in fact, most remorseful about is having been caught. Finally, to find a "selfish motive," one need look no further than to the fact that in the cases involving Vertecs and Restec Dann was taking credit for work actually done by another. To Dann went the glory, and also the higher fees. Dann "has not acknowledged that the preponderance of his actions were in any way dishonest or deceitful .... his continued insistence that he has acted properly leaves us quite uncertain that he would not repeat his ethical misconduct." In re Disciplinary Proceeding Against Vetter, 104 Wash.2d 779, 792, 711 P.2d 284 (1985).
Under the Standards, 13 factors associated with attorney misconduct are considered as mitigating the sanction to be imposed. See, e.g., Johnson, 118 Wash.2d at 706, 826 P.2d 186 (listing factors). Five were found by the hearing officer here: "(a) absence of a *422 prior disciplinary record; (d) timely good faith effort to make restitution or to rectify the consequences of some misconduct; (i) delay in disciplinary proceedings; and (l) remorse." CP at 155-56. The hearing officer also noted the significant publicity that the case had received and found that "this publicity is a form of penalty which qualifies under (k) imposition of other penalty." CP at 156. Dann's most important argument is that the delay in instituting disciplinary proceedings and the publicity surrounding the case should have mitigated the sanction imposed upon him to a reprimand.
Dann cites In re Disciplinary Proceeding Against Ressa, 94 Wash.2d 882, 621 P.2d 153 (1980), for the proposition that disciplinary proceedings must commence "within a reasonable time after the Bar Association learns of an attorney's misconduct." Resp't's Opening Br. at 45. He does not cite to any page for this blanket proposition, with good reasona reading of the case does not support it. In Ressa, the delay prior to the Disciplinary Board's recommended sanction came nearly four years after the attorney admitted misconduct, and three years after the formal complaint was filed (and thus made public). Even this was deemed "not violative of due process." Ressa, 94 Wash.2d at 884, 621 P.2d 153. Moreover, the attorney in Ressa may "have justifiably thought the deferred prosecution would become the ultimate disposition of his case." Ressa, 94 Wash.2d at 884, 621 P.2d 153. In other words, the holding in Ressa appears to be fact-specific in light of that case's "peculiar facts," Ressa, 94 Wash.2d at 885, 621 P.2d 153 (Brachtenbach, J., concurring), and cannot be read as broadly as Dann would have this court read it. Ressa also predates our adoption, in In re Disciplinary Proceeding Against Rentel, 107 Wash.2d 276, 283, 729 P.2d 615 (1986), of the Standardswherein delay in disciplinary proceedings is placed into context as but one mitigating factor to be balanced against a number of aggravating factors. Furthermore, the hearing examiner did expressly take delay into considerationand the Disciplinary Board may have taken it even more seriously, given its recommended halving of the suspension proposed by the hearing officer.[5]
Dann also blames the WSBA for the article that appeared in The Seattle Times-Seattle Post-Intelligencer. He does this by claiming that the WSBA had a "role in publicly condemning Wade Dann in the media before he was charged." Resp't's Opening Br. at 48. This, Dann contends, was a violation of RLD 11.1which provides for confidentiality in disciplinary proceedings. However, the article itself noted that "[t]he Bar Association refuses to acknowledge [the grievant's] complaint even exists, citing confidentiality rules." Ex. N at 3. While the grievant spoke with the press, that was not a violation of RLD 11.1. Remarkably, Dann blames the WSBA for something outside of its control: the reporting of a news story to which the WSBA did not contribute information. Nor does a letter unilaterally conveying Dann's request that information not be provided to the grievant constitute a bilateral agreement to not provide the grievant with that information. What the grievant did with that information by making it public was perhaps unfortunate, but it was not the fault of the WSBA. Again, the hearing examiner did take this publicity into consideration as a mitigating factor, and the Disciplinary Board may have also done so when it recommended reduction of the suspension proposed by the hearing officer.
Dann also argues for mitigation due to "the voluntary `self-policing' by Wade Dann and his firm which ended billing irregularities before notice to the Bar Association." Resp't's Opening Br. at 32-33. Ending misconduct does not erase, however, that misconduct which has already occurred. Even where an attorney has been rehabilitated prior to the imposition of discipline, "the legal system itself has not been redeemed." In re Disciplinary Proceeding Against Kennedy, 97 Wash.2d 719, 723, 649 P.2d 110 *423 (1982). Nor was it Dann himself who initiated the end to the misconduct. We find that the hearing officer properly weighed the mitigating factors.
We have previously noted that "[a]s the only body to hear the full range of disciplinary matters, the [Disciplinary] Board has the opportunity to develop unique experience and perspective in the administration of sanctions. We should not lightly depart from recommendations shaped by this experience and perspective." In re Disciplinary Proceeding Against Noble, 100 Wash.2d 88, 94, 667 P.2d 608 (1983). Accordingly, we will adopt the Disciplinary Board's recommendation unless one or more of the following five Noble factors should clearly persuade the court that the sanction recommended is inappropriate:
1. The purposes of attorney discipline (sanction must protect the public and deter other attorneys from similar misconduct);
2. The proportionality of the sanction to the misconduct (sanction must not depart significantly from sanctions imposed in similar cases);
3. The effect of the sanction on the attorney (sanction must not be clearly excessive);
4. The record developed by the hearing panel (sanction must be fairly supported by the record and must not be based upon considerations not supported by the record); and,
5. The extent of agreement among the members of the Board (sanction supported by unanimous recommendation will not be rejected in the absence of clear reasons).
In re Discipline of Johnson, 114 Wash.2d 737, 752, 790 P.2d 1227 (1990) (summarizing Noble, 100 Wash.2d at 95-96, 667 P.2d 608). Perhaps overlooked is the fact that an appeal of the Disciplinary Board's decision carries with it the chance that we might increase the recommended sanction instead of simply adopting or decreasing it.[6]See, e.g., In re Disciplinary Proceeding Against Lynch, 114 Wash.2d 598, 789 P.2d 752 (1990) (rejecting an appealed six-month suspension and imposing a two-year suspension instead); Selden, 107 Wash.2d 246, 728 P.2d 1036 (rejecting an appealed 60-day suspension and disbarring instead).
Dann argues that "[c]ases involving attorney discipline that reach the Supreme Court almost always involve serious misconduct that could result in substantial criminal penalties." Resp't's Opening Br. at 37. This is a highly questionable assertion, and one unsupported by any citation to empirical evidence. Due to "the absence of criminal misconduct" in his case, Dann argues that "a one year suspension is unjustifiably punitive." Resp't's Opening Br. at 39. Dann cites to no case, however, directly supporting this proposition and we will not strain to find one.
Dann also makes a related proportionality argument by citing the only directly analogous case involving a Washington attorney receiving a sanction for initial-switching.[7] In re Bennett, Bar No. 8084. There we imposed, under RLD 12.6, a reciprocal order of censure for an attorney licensed in both Washington and Alaska based upon a stipulated order of censure adopted by the Alaska Supreme Court. Bennett is not dispositive here, however. First of all, even in cases originating in Washington, stipulations are not precedents that bind this court, although they can be helpful. See In re Disciplinary Proceeding Against Plumb, 126 Wash.2d 334, 343, 892 P.2d 739 (1995) (citing Curran, 115 Wash.2d at 756 n. 2, 801 P.2d 962 ("`approval of a stipulation is not binding precedent'").) Second, "RLD 12.6 is designed to obviate the need for the WSBA to relitigate a complaint that has already been fully and finally litigated in another jurisdiction." In re Disciplinary Proceeding Against Immelt, 119 Wash.2d 369, 371, 831 P.2d 736 (1992). Accordingly, the reciprocal order in Bennett by no means guides this court in making its decision here. Moreover, in Bennett no overbilling was alleged or proved. See Bennett, Bar No. 8084.
*424 Dann also cites the fact that Radder and Greenberg, his partners at DGR, respectively received a 90-day suspension and a reprimand for their roles in the initial-switching. However, both stipulated to these sanctions. Again, a stipulation is not a binding precedent. Dann did not refute testimony that showed that the misconduct of Radder and Greenberg involved Dann, and the facts make it clear that Dann's misconduct went beyond that of both. It is surprising, then, that Dann argues for consistency and then somehow uses Radder's suspension to suggest that Dann, the architect of this wrongdoing, only deserves a reprimand. Dann's case has separate facts and should be considered separately.
In this case, we have no record of what the Disciplinary Board may have considered or evaluated in making its decision other than the hearing officer's findings of fact and conclusions of law, which the Disciplinary Board unanimously approved and adopted. In examining this information in light of the five Noble factors listed above, then, we find, as noted earlier, that the record showed that the hearing officer's findings of fact were well-supported by a clear preponderance of the evidence, and his decision did not cite to any considerations outside of the record (factor 4.) As is also noted above, there are no directly analogous cases to guide this court in determining the proportionality of the sanction (factor 2). The Disciplinary Board was unanimous (factor 5) and suspension would provide a clear warning to other attorneys, as well as educate a not entirely repentant attorney here and, consequently, it is to be hoped, protect the public (factor 2). Moreover, the effect of the sanction upon the attorney is mitigated by the fact that what could easily have drawn disbarment, and was recommended for a two-year suspension, is now just a year-long suspension. Of course, one cannot doubt that this sanction will be hard to bear. However, it does not appear to be "clearly excessive" (factor 3) and Dann does not offer any unique circumstances explaining why the hardship upon him would be undue. It is doubtful that the sanction would be affected even if he did. See Curran, 115 Wash.2d at 774, 801 P.2d 962 (financial problems not a mitigating factor in considering length of an attorney's suspension).
We have written before that "[t]he duty of this court is to protect the public from dishonest, deceitful lawyering." Vetter, 104 Wash.2d at 793, 711 P.2d 284. Recognizing that duty and the findings of the Disciplinary Board which we hold are supported by the evidence, we adopt the Board's recommendation and order Wade R. Dann suspended from the practice of law for one year.
DURHAM, C.J., and DOLLIVER, SMITH, GUY, JOHNSON, MADSEN, TALMADGE and SANDERS, JJ., concur.
NOTES
[1] Both of Dann's law partners stipulated to discipline arising out of initial-switching incidents. In re Radder, Bar No. 16416 (90-day suspension); In re Greenberg, Bar No. 17661 (reprimand).
[2] Contrary to Dann's argument, where clients themselves did not come forward to complain about Dann's billing practices, that fact does not provide circumstantial evidence rebutting the misconduct charges. Even assuming that some clients tacitly approved of his misconduct, "[t]he disciplinary rules govern the conduct of lawyers; misconduct is not something other than misconduct when it is approved by others." In re Complaint of Dinerman, 314 Or. 308, 840 P.2d 50, 55 (1992). The injury is as much to the image of the legal profession as it is to the individual client.
[3] This misconduct could also have fallen under the rubric of standard 4.62: "Suspension is generally appropriate when a lawyer knowingly deceives a client, and causes injury or potential injury to the client." STANDARDS FOR IMPOSING LAWYER SANCTIONS std. 4.62, at 11 (1991). However, standard 7.2 appropriately speaks to the broader ramifications of Dann's misconduct (i.e., its impact upon the public and legal system).
[4] For example, Dann argues that the "[t]he investigation of Wade Dann followed the theft of firm records by a disgruntled associate who engaged in vigilante tactics." Resp't's Opening Br. at 49 (emphasis added). Even the grievant's physical appearance in a newspaper photo is treated with sarcasm. If these ad hominem attacks were meant to persuade this court they have failed.
[5] Unmentioned by Dann is the fact that at least a few months of the delay are accounted for by his own actions: a September 1995 request to the bar not to proceed with the matter until settlement could be discussed, a negotiation process that ended unfruitfully in December 1995, and a subsequent request (ultimately denied on May 1, 1996 upon review) that the filing of disciplinary charges be deferred pending the outcome of the civil malpractice litigation from Henderson.
[6] The familiar expression, "It never hurts to ask," is not necessarily true in attorney discipline cases.
[7] Similarly, the WSBA brings to this court's attention In re Stafford, Bar No. 2931. However, that case is not directly on point for while it did involve dishonesty, which is admittedly relevant here, it also involved unauthorized practice of law by an attorney on inactive status. See Stafford, Bar No. 2931. It is factually dissimilar to this case and cannot stand for the blanket proposition that dishonesty by an attorney merits a year-long suspension.